1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

9   Sportlite, Inc.,                        )   No. CIV 04-2146-PHX-MHM
                                            )
10              Plaintiff,                   )
                                            )   **ORDER**
11  vs.                                     )
                                            )
12                                          )
    Genlyte Thomas Group, LLC and Day-)
13  Brite Lighting,                         )
                                            )
14              Defendant.                   )
                                            )
15  _____ )

16

17          Currently before the Court is the Special Master Thomas G. Watkins' ("Mr. Watkins"

18  or "Special Master") Final Report and Recommendation on Claim Construction (Dkt.#131);

19  Defendants' Genlyte Thomas Group, LLC and Day-Brite Lighting ("Defendants")

20  Objections to Special Master's Report and Recommendation (Dkt.#101); Plaintiff Sportlite,

21  Inc.'s ("Plaintiff") Motion to Adopt the Report and Recommendation of the Special Master

22  (Dkt.#103); Plaintiff's Motion to Dispense With Further Briefing on Motion to Adopt

23  (Dkt.#105); and Defendants' Motion to Disallow Compensation to the Special Master and

24  to Disgorge Fees Paid (Dkt.#106-3).   After reviewing the pleadings and holding oral

25  argument on February 28, 2007, the Court issues the following Order.

26  **I.      Procedural History**

27          On October 12, 2004, Plaintiff filed suit against Defendants asserting a claim of patent

28  infringement against Defendants with respect to United States Patent No. 36,414 (the '414

1    Patent). (Dkt.#1).   On November 16, 2005, upon agreement of the Parties, this Court

2    appointed Mr. Watkins to act as Special Master pursuant to Rule 53, Fed.R.Civ.P with

3    respect to the claim construction phase of this litigation.  (Dkt.#52).   After briefing was

4    submitted, Mr. Watkins, in conjunction with the Court, held a Markman hearing to address

5    the relevant claims on February 22, and 23, 2006. (Dkt.#73,74).   Although the Court directed

6    the Special Master to submit the Report and Recommendation regarding the relevant claims

7    within 30 days of the Markman hearing (Dkt.#52), the Special Master did not submit the

8    Final Report and Recommendation until September 13, 2006. The Defendants filed their

9    objections with respect to several aspects of the Report and Recommendation on October 3,

10   2006. (Dkt.#101).   In addition, on October 5, 2006, shortly after learning of pending

11   disciplinary action against the Special Master before the Arizona State Bar, the Defendants

12   moved to vacate the reference to the Special Master, strike the Report and Recommendation

13   as well as disallow and disgorge the Special Master's fees. (Dkt.#106).   In light of the

14   disciplinary proceedings against Mr. Watkins, which are not related to this litigation, the

15   Court held a status conference on December 13, 2006. (Dkt.#122).   The Court after

16   reviewing the previously unknown disciplinary proceedings denied the Defendants' motion

17   to vacate the reference and strike the Report and Recommendation. (Dkt.#122).   However,

18   the Court took under advisement the Defendants' request to disallow and disgorge funds paid

19   to the Special Master arising from his work during the claim construction phase of this

20   litigation. (Dkt.#106-3). On February 28, 2007, the Court conducted a lengthy oral argument

21   regarding Defendants' objections to the Report and Recommendation. (Dkt.#129).   The

22   Court will address the Defendants' objections and request to disallow and disgorge

23   compensation now.

24   **II.    Defendants' Objections to the Special Masters' Report and Recommendation**

25        **A.    Standard of Review**

26        In reviewing the Special Master's Report, this Court reviews de novo all objections

27   to findings of fact and/or conclusions of law made or recommended by the special master

28

1  See Fed.R.Civ.P. 53(g)(3)&(4). Matters of procedure are reviewed for abuse of discretion.

2  See Fed.R.Civ.P. 53(g)(5).

3          The construction of patent terms is a question of law determined by the court.

4  Markman v. Westview Instruments, Inc., 52 F.3d 967, 983-84 (Fed.Cir. 1995). "It is a

5  'bedrock principle' of patent law that 'claims of a patent define the invention to which the

6  patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312

7  (Fed.Cir. 2005) (en banc) (citation omitted).     The words of claims "are generally given

8  their ordinary and customary meaning." Id. at 1312 (citing Vitronics Corp. v. Conceptronic,

9  Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The ordinary and customary meaning of a claim

10  is the meaning that the term would have to a person of ordinary skill in the art in question at

11  the time of the invention . . . ." Id. at 1313.   "Importantly, the person of ordinary skill in the

12  art is deemed to read the claim not only in the context of the particular claim in which the

13  disputed term appears, but in the context of the entire patent, including the specification."

14  Id.   In cases where the ordinary meaning of claim language is not readily apparent to a lay

15  judge, "the courts look to 'those sources available to the public that show what a person of

16  skill in the art would have understood disputed claim language to mean.'" Id. at 1314

17  (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111,

18  1116 (Fed.Cir. 2004)).  "Those sources include 'the words of the claims themselves, the

19  remainder of the specification, the prosecution history, and extrinsic evidence concerning

20  relevant scientific principles, the meaning of technical terms, and the state of the art." Id.

21  (citation omitted).  The court may in its discretion receive extrinsic evidence to aid the court

22  in coming to a correct conclusion as to the true meaning of language employed in the patent.

23  Markman, 52 F.3d at 980.  "Extrinsic evidence consists of all evidence external to the patent

24  and prosecution history, including expert and inventor testimony, dictionaries, and learned

25  treatises." Id.

26      **B.    Analysis**

27          Defendants raise objections to the Special Master's Report and Recommendation with

28  respect to the following claim terms construed by the Special Master: (1) "substantially

- 3 -

1  parallel said reflector;" (2) "substantially parallel the fixture;" (3) "lamp support means;" (4)

2  "reflector means;" and (5) "substantial uniform distribution of light."

3              **(1)    "Substantially Parallel Said Reflector"**

4         Defendants object to the Special Master's recommended construction of "substantially

5  parallel said reflector" appearing in claims one and thirty-seven of the '414 Patent.

6  Originally, when construing these terms the Parties proposed similar interpretations.  For

7  instance, Plaintiff proposed "[t]he lamps are close enough to parallel or generally parallel to

8  the reflector such that the uniformity of lighting as generally described in the patent is

9  achieved."  Defendants proposed that the "[t]he lamps largely, but not wholly, follow the

10 contour of (i.e. parallel) the reflector."  Even though these proposed constructions were not

11 substantially different, the Special Master proposed a much different construction which

12 appears to encompass both a "visual" and "textual" construction.  For example, with respect

13 to the "visual" definition, the Special Master concluded in pertinent part:

14        The appropriate interpretation of "substantially parallel" neither rests on
          concepts of geometry nor concepts of parallelism, nor the application of a rule
15        to a scaled drawing.  Instead, the "generally parallel" relationship between a
          linear compact fluorescent lamp and a curved reflector represents a visual
16        relationship which is both defined in terms of what the language means as well
          as what is illustrated in the drawings . . . So, in the context of the present case
17        . . . the "substantially parallel relationship represents an "eyeball" definition
          rather than a textual definition."
18 (Report and Recommendation, pp.14-15).

19        Perhaps what is most troubling about this visual construction is that it does not appear

20 to be a construction of the claim terms.  In fact, if the Court were to adopt such a "visual" or

21 "eyeball" definition, the construction would ultimately be left to the jury as a finding of fact

22 rather than a determination of law made prior to the trial by the Court.  Importantly, as noted

23 above and by the Defendants, claim construction is a matter of law that is to be determined

24 by the Court.  Markman, 52 F.3d at 983-84.  Based upon the Special Master's proposal the

25 jury would have to identify certain points on Plaintiff's patented lighting apparatus and

26 compare with certain points on the accused device.  Such a possibility is not consistent with

27 the purpose of the claim construction portion of this litigation.

28

                                           - 4 -

Similar to the Special Master's "visual" or "eyeball" definition, the Special Master's textual definition of "substantially parallel said reflector" appears to run contrary to settled claim construction principles.  Specifically, the textual definition recommends in pertinent part:

> A compact fluorescent lamp (such as lamp 45 shown in Fig. 15 of the Tickner patent) is a linear or straight line device that defines one of the two lines to be compared to evaluate whether the compact fluorescent lamp is substantially parallel to the sliced reflector.
>
> The curved exposed edge of the sliced reflector (as illustrated in Fig. 15) from the top of the slice to the bottom of the slice can be thought of as many short, straight reflector segments joined end to end.
>
> If any one of those numerous straight reflector segments located anywhere between the top of (sic) the bottom of the reflector slice is "more or less" or "about" or "generally" parallel to the compact fluorescent lamp, then you may find that the compact fluorescent lamp is substantially parallel to the reflector.

(Report and Recommendation, p.15).

As argued by the Defendants, the Special Master's textual definition appears  to change or broaden the scope claim.  The Special Master takes the original claim language and broadens it to be "substantially parallel any one of those numerous straight reflector segments located anywhere between the top [or] the bottom of the reflector slice . . . ."  As evidenced by the prosecution history of the '414 Patent, the Special Master's textual definition appears to run contrary to the inventor's intent.  For instance, in response to an office action, regarding the relationship between the instant '414 Patent and the relevant prior art, the Schmidt and McNair patents, Mr. Tickner, in describing the relationship between the reflector and fluorescent lamps stated the "lamps . . . extend outwardly at an angle along a line generally parallel to the surface of said reflector means . . . .." (Defendants' Objections, Exhibit E, p.2).  At no point does the prosecution history of the '414 Patent evidence some type of relationship where only a point on the reflector is parallel or generally parallel the fluorescent lamps.  Thus, given the Special Master's apparent rejection or failure to consider the relevant prosecution history and the Special Master's  proposal that may change the scope of the claim, the Court will not adopt the Special Master's proposed construction.  Rather, given the Parties close proposals that appear generally to be in line with the intrinsic

1    evidence regarding the construction of "substantially parallel said reflector" the Court, upon

2    Defendants' recommendation, adopts Plaintiff's proposed construction. Thus, "substantially

3    parallel said reflector" will be construed to mean "[t]he lamps are close enough to parallel

4    or generally parallel to the reflector."[1]

5                      **(2)    "Substantially Parallel the Fixture"**

6            Defendants raise issue with the Special Master's alleged failure to address their

7    indefiniteness argument within the context of "substantially parallel the fixture" appearing

8    in Claim 37 of the '414 Patent.  Defendants argue that it cannot be construed because it is

9    wholly inconsistent with the previous claim term, discussed above, "substantially parallel

10   said reflector."  However, in reviewing the Report and Recommendation, it does not appear

11   that the Special Master failed to consider the argument, but rejected Defendants' argument

12   based upon his determination that "fixture" could and should be used interchangeably with

13   "reflector" in Claim 37.  Specifically, the Special Master concluded that "the Claim 37 term

14   "fixture"  should  be  substituted  for  the  Claim 1  term  "reflector."     (Report  and

15   Recommendation, p.25).

16           Defendants cite extrinsic evidence from the Lighting Handbook from the Illumination

17   Engineering Society of North America in support of their argument that it is not possible

18   what Claim 37 contemplates with its language of "the light generating portions extend

19   outwardly at an angle . . . to substantially parallel the fixture."  According to Defendants, the

20   Lighting Handbook demonstrates that a "fixture" encompasses "a lamp or lamps and

21   ballasting," thus making it impossible for "a lamp [to] parallel a fixture of which it is a part

22   . . . ."  (Defendants' Objection, p.14).   However, the Defendants' argument and use of

23   extrinsic evidence ignores the relevant intrinsic evidence that supports the construction of

24   this claim term.   Notably, the language of the claim suggests that the fixtures and the

25   reflector are one in the same because of the language "outwardly flared fixtures."  Moreover,

26

27           [1]Notably, at the oral argument hearing on February 28, 2007, Plaintiff's counsel
     indicated that Plaintiff would not object to adopting Plaintiff's proposed version, but urged
28   the Court to adopt the Special Master's proposal.

the specification of the '414 Patent refers to the terms interchangeably with such language as "reflector/fixture" ('414 Patent, Col. 8, l.1) and that the "reflector . . . is a generally circular bell-shaped or outwardly flared fixture . . ." ('414 Patent, Col. 8, ll. 8-10). The specification further distinguishes between the lamps and fixtures by contemplating "lamps located within the fixture." ('414 Patent, Col. 8, ll. 57-63). As such, contrary to the Defendants' argument, the intrinsic record reveals that the lamps and the fixtures are not one in the same, thus providing for the possibility that the lamps can parallel the fixtures. Therefore, claim 37, consistent with the Special Master's determination is not indefinite and can be construed.

### (3) "Reflector Means"

The Special Master, in construing the "reflector means" limitation " recommends that it be construed:

> as encompassing either a totally reflective reflector, a partially reflective reflector, as well as a partially light transmissive reflector, with or without apertures or openings in the reflector itself, where the reflector is capable of radiating light through or out of the reflector in all directions, including both laterally and upwardly.

(Report and Recommendation, p.5).

Defendants object to this construction because the Special Master's proposal erroneously permits the transmission of light through the reflectors due to the existence of "apertures or openings" within the reflector itself. According to the Defendants, "the Special Master errs . . . by not recognizing that light passing through such apertures is irrelevant to defining what the 'reflector' _itself_ must be." (Defendants' Objections, p.13) (Emphasis original).

However, the Defendants' argument is not well taken as it appears to import an additional limitation that is not contemplated in the '414 Patent claims or specification; that is, a reflector that is completely reflective despite the existence of "apertures or openings" that undoubtedly allow for the transmission of light through the reflector. Notably, Claim One of the '414 Patent does not expressly or impliedly separate the existence of the "apertures or openings" from the scope of the reflector. Rather, the plain language of the

claim simply contemplates a reflector which encompass all of its characteristics and aspects such as "apertures and openings."  In other words, the relevant reflectors with their openings are not somehow separated out so as to exclude the "apertures or openings" from the reflector's scope.  To accept Defendants' position would appear to require this Court to exclude two of the three preferred embodiments disclosed in the '414 Patent.  For instance, as noted by the Special Master, the specification of the '414 Patent, when describing the second embodiment disclosed in Figure 9 discusses the existence of open spaces "to permit the passage of air into the interior of the fixture" and "to permit the passage of heated air outwardly from the fixture."  ('414 Patent, Col.8, ll.30-44).  In addition, the specification, when describing Figure 16 of the third embodiment states that the reflector possesses "slots . . . to permit the passage of heated air outwardly from the reflector . . . ." ('414 Patent, Col.9, ll.53-59).  Thus, it is clear that the preferred embodiments and specification of the '414 Patent contemplate the existence of holes within the reflectors themselves that would allow for the transmission of light along with the passage of air.  To accept Defendants' proposed construction of "reflector means" the Court would simply have to ignore the relevant "apertures or openings" within the reflectors.  However, to do so would run contrary to what is already contemplated within the relevant embodiments and thus would potentially exclude such embodiments as well as add an additional limitation requiring the reflectors to be completely reflective despite the existence of holes that permit the passage of light.  Such a construction is contrary to Federal Circuit authority.  See Primos, Inc. v. Hunter's Specialities, Inc., 451 F.3d 841, 848 (Fed.Cir. 2006) ("[W]e also should not normally interpret a claim term to exclude a preferred embodiment.").

In addition to the support of the Special Master's construction of "reflector means" within the preferred embodiments and specification of the '414 Patent, it appears that the extrinsic record would support the determination that the reflector may allow the transmission of light through the reflectors themselves.  Notably, the Lighting Handbook from the Illumination Engineering Society of North America, which both Parties placed heavy reliance on, contemplates the possibility that a "reflection" provides for the possibility

of the transmission of light through the reflecting material. (Defendants' Markman Hearing Exhibits, Exhibit 39, p.17). While this extrinsic evidence is by no means controlling it is consistent with the Special Master's interpretation and the intrinsic record of the '414 Patent. Accordingly, the Court will adopt the Special Masters' construction of "reflector means."

### (4)   "Lamp Support Means"

Defendants object to the Special Master's construction of "lamp support means" as it appears in Claim One of the '414 Patent. The relevant language at issue reads in pertinent part:

> lamp support means located within said reflector means at the base end thereof for supporting a plurality of compact fluorescent lamps substantially equally angularly displaced about said center line within said reflector means between the base end and the light-emitting end thereof, said lamp support means included at least two lamp support surfaces on said lamp support means on opposite sides thereof and angled toward the base end of said reflector means for causing compact fluorescent lamps supported thereby to extend outwardly at an angle from said center line toward the light-emitting end of said reflector means to substantially parallel said reflector means . . .

Specifically, Defendants object to the Special Master's recommendation that the presumption created by 35 U.S.C. ¶ 112, ¶ 6 ("112/6")[2] due to the use of the word "means" in combination with "lamp support" is rebutted due to a finding that the claim (Claim One) recites sufficient structure or material for performing the function. However, in reviewing the Special Master's determination, the Court finds that the Special Master's finding is without error.

As noted by the Special Master, the presumption of the application of 112/6 created by the use of the word "means" in conjunction with a claim term may be rebutted if: (1) the claim element that uses the word "means" recites no function corresponding to the means,

----

[2] 35 U.S.C. § 112, ¶ 6 provides as follows:
An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

1    or (2) the claim element also recites sufficient structure or material for performing the

2    function. Rodime PLC v. Seagate Tech, Inc., 174 F.3d 1294, 1302 (Fed.Cir. 1999) (citation

3    omitted).  In the instant case, the Special Master determined that the latter basis applied to

4    rebut the 112/6 presumption because the claim recites sufficient structure as the described

5    structure is capable of performing entirely the recited function.  The Special Master made this

6    determination because the following functions recited in the above language are provided

7    with the sufficient structure to perform their function: (1) to support a plurality of compact

8    fluorescent lamps substantially equally angularly displaced about the center line, or the

9    vertical axis of the fixture and (2) to support the lamps within the reflector between the base

10   and light-emitting end so that they are substantially parallel to the reflector.[3]

11        In opposition to the Special Master's finding, the Defendants argue that is error

12   because "there is no evidence . . . to demonstrate (and rebut the presumption) that the 'lamp

13   support surfaces' are 'sufficiently definite' structure for performing entirely the above-

14   mentioned functions."  (Defendants' Objections, p.11) (Emphasis original).  In support of

15   this argument, Defendants cite that the recited function completely omits any reference as

16   to how the "lamp support means" "support" the lamps.  In addition, Defendants contend that

17   the Special Master fails to consider how the "lamp support surfaces" support the lamps

18   "about said centerline."  In other words, and as articulated at oral argument, Defendants

19   contend that the most basic issue of how the lamps are actually supported, i.e., fastened, is

20   an open question and is wholly absent from the claim language, thus bringing "lamp support

21   means" within the scope of 112/6.

22        The Defendants' argument ignores the relevant evidence that this Court may consider

23   in determining and construing the language of a claim.  In determining whether the 112/6

24   presumption is properly rebutted this Court considers "evidence intrinsic to the patent and

25

26        [3]As noted by Defendants, the Special Master did not note the function of supporting
     the lamps so that they are substantially parallel to the reflector, but the Court finds this
27   omission to be insignificant as this function falls within the scope of the Special Master's
28   construction and rebuttal of the 112/6 presumption.

1    any relevant extrinsic evidence so warrant." <u>Personalized Media Communications, LLC v.</u>

2    <u>International Trade Com'n</u>, 161 F.3d 696, 704 (Fed.Cir. 1998), <u>see also</u>, <u>Cole v. Kimberly-</u>

3    <u>Clark Corp</u>., 102 F.3d 524, 531 (Fed.Cir. 1996) (noting that whether [112/6] is invoked

4    involves an analysis of the "patent and the prosecution history," and consulting a dictionary

5    definition of "perforation" to understand if one of skill in the art would understand this term

6    to connote structure). The intrinsic evidence clearly answers the Defendants' questions

7    regarding the support to the lamps identified in Claim One.[4]  For instance, and as conceded

8    at oral argument by the Defendants, the specification of the '414 Patent defines what would

9    constitute sufficient "lamp support."   The Special Master noted such in the Report and

10   Recommendation by stating that "the written description defines the relevant structure itself

11   as a "lamp support." (Report and Recommendation, p.9 (citing '414 Patent, Col. 4, l. 65)).

12   In addition, as noted by Plaintiff, the specification identifies that the "compact fluorescent

13   lamps" include both the lamps and the sockets to support and secure them.  ('414 Patent,

14   Column 8, Lines 49-52 - "[t]he base end of the fixture is divided into eight equal segments

15   125/126 to provide a mounting surface or lamp support surface for mounting compact

16   fluorescent lamps 40/45 on each of the surfaces . . .").   As such, the Defendants' argument

17   is not well taken on this point as it fails to consider the relevant intrinsic evidence in

18   determining the application of the 112/6 presumption raised by the use of "lamp support

19   means."   Moreover, this intrinsic record also rebuts Defendants' argument regarding any

20   alleged inconsistency between the prosecution history of the '414 Patent and the

21   inapplicability of the 112/6 presumption.  In fact, it is relevant to note that Mr. Tickner, in

22   support of his reissued application, provided a declaration to the USPTO that "it was never

23   [his] intention to define this element using functional language under [112/6] . . ."

24   (Defendants' Markman Hearing Exhibits, Exhibit 12, GT 003701).

25   _____

26        [4]"It is well established that, in interpreting an asserted claim, the court should look
     first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the
27   specification, and, if in evidence, the prosecution history." <u>Bell Atlantic Network Services,</u>
     <u>Inc. v. Covad</u>, 262 F.3d 1258, 1267 (Fed.Cir. 2001).
28

1    As such, because the Special Master properly applied and rejected the presumption

2    of 112/6 raised by "lamp support means," the Court will overrule Defendants' objections to

3    the Report and Recommendation in this respect.

4                    **(5)    "Substantial Uniform Distribution of Light"**

5    At oral argument Defendants did not identify the Special Master's construction of

6    "substantial uniform distribution of light" of Claim 37 as being in dispute, but did so in their

7    written objections to the Court.  Specifically, the Defendants object to the Special Master's

8    conclusion that the terms "encompass[] relatively wide variations in the extremes of

9    maximum intensity and minimum intensity over wide variations in either lateral or vertical

10   positions, while at the same time substantially preserving uniformity with respect to

11   relatively minor positional displacements, either vertical or lateral."   (Report and

12   Recommendation, p.26).  Defendants contend that nothing in the intrinsic record supports

13   such a construction. (Defendants' Objections, p.15). However, Defendants' objection is not

14   well taken.  In fact, it appears that the Special Master's construction derives directly from the

15   intrinsic record of the '414 Patent.  The chart developed by the Special Master on page 26

16   of the Report and Recommendation setting forth his findings as to light emitting lighting

17   apparatuses producing the "substantial uniform distribution of light" is based upon Tables

18   1 and 2 of the '414 Patent.  Moreover, such numbers relied on by the Special Master in

19   formulating "max intensity," "minimum intensity" average intensity" derive directly from

20   the '414 Patent.  As such, in reviewing the Special Master's interpretation and reliance upon

21   the relevant intrinsic record, the Court finds that the Special Master's construction is sound

22   and will overrule Defendants' objection.

23   **III.    Summary of Objections**

24   The Court will overrule in part and sustain in part the Defendants' objections to the

25   Special Master's Report and Recommendation.   Specifically, the Court will sustain

26   Defendants' objection to the Special Master's construction of "substantially parallel said

27   reflector." The Court, upon de novo review, finds that the Special Master's recommendation

28   does not withstand scrutiny. Accordingly, the Court, upon Defendants' recommendation,

1  will construe the term consistent with the Plaintiff's original construction.  The Court, upon

2  de novo review, will overrule all other objections filed by the  Defendants to the Special

3  Master's Report and Recommendation as the construction of such terms is supported by

4  principles of patent law and claim construction.

5  **IV.    Defendants' Motion to Disallow Compensation to the Special Master and to**
   **Disgorge Fees Paid.**

6

7         As referenced at the outset of this Order, the Court has been apprised of some

8  troubling circumstances surrounding the Special Master's conduct and current status as a

9  member of the Arizona State Bar.   As such, based upon the Defendants' request, and the

10  Court's obligation to ensure the reasonableness of the Special Master's requested fee, the

11  Court will review the Special Master's conduct in this case.

12          On October 26, 2005, the Court conducted a Scheduling Conference based upon the

13  Parties' request to discuss scheduling matters associated with the claim construction phase

14  of this litigation.  At the hearing, the Parties did not object to the appointment of a special

15  master to assist in this phase to construe the relevant claims.   As such, the Court directed the

16  Parties to meet and confer and jointly submit a list of three "qualified candidates for possible

17  appointment as special master in this case." (Dkt.#45).   The Parties submitted only Mr.

18  Watkins as a "qualified candidate" and the Court accepted the Parties' proposal on November

19  16, 2005. (Dkt#47).  Mr. Watkins' acted as Special Master in all of the relevant subsequent

20  claim construction proceedings which included reviewing the Parties' briefing, conducting

21  the day and one-half Markman hearing, submitting a proposed Report and Recommendation

22  and the submission of the Final Report and Recommendation on September 13, 2006.

23  However, shortly after the Defendants' Objections, which are addressed above, the

24  Defendants discovered significant pending disciplinary proceedings against Mr. Watkins

25  before the Arizona State Bar.  (Defendants' motion to vacate, Dkt.#106). These proceedings

26  are based upon Mr. Watkins' conduct involving his representation of a former client, Taser

27  International, Inc.  In fact, unbeknownst to the Court and apparently the Parties, Taser

28  International, Inc., was involved in civil litigation against Mr. Watkins in Maricopa County

- 13 -

1    Superior Court, CV No. 05-0357, asserting claims of breach of fiduciary duty, constructive

2    fraud and breach of contract arising out Mr. Watkins' conduct and claim of ownership of a

3    Taser patent.  On September 11, 2006, in the related disciplinary proceeding, an Arizona

4    State Bar hearing officer recommended that Mr. Watkins' be disbarred for multiple ethical

5    violations arising from his representation of Taser, including deception, lack of candor and

6    fraud and misrepresentation. (Defendants' motion to vacate, Dkt.#106, Exhibit A).

7    Importantly, both the civil and disciplinary proceedings were ongoing prior to Mr. Watkins'

8    acceptance of his appointment as Special Master in this action and Mr. Watkins did not

9    disclose his involvement in either of the proceedings during the course of the litigation.

10   Rather, it was not until after the State Bar hearing officer's recommendation of disbarment

11   that the Defendants became aware of the issue and disclosed it to the Court through their

12   Motion to vacate and strike the Report and Recommendation and Motion to disgorge and

13   disallow the payment of fees to Mr. Watkins.  At the Court's December 13, 2006 status

14   hearing, the Court denied the Defendants' Motion to vacate and strike based upon the de

15   novo standard of review invoked by the Court, the unrelated aspect of the civil litigation and

16   State Bar proceedings to this litigation and the lack of indication suggesting Mr. Watkins'

17   expertise in the patent field was lacking.  However, the Court took the Defendants' request

18   to disgorge and disallow the payment of fees under advisement and will address the request

19   now.

20          Considering the circumstances surrounding Mr. Watkins' service as Special Master

21   in this case and complete failure to disclose, at any time, his involvement in litigation and

22   disciplinary proceedings calling into his question his legal ethical behavior, the Court finds

23   that it is appropriate to grant the Defendants' request, in part.  Perhaps what is most troubling

24   is that Mr. Watkins did not disclose his involvement in such proceedings even though such

25   proceedings commenced prior to his appointment as Special Master in this case.  Given the

26   troubling circumstances surrounding the disciplinary proceedings involving Mr. Watkins'

27   representation of a client in other patent proceedings it was clearly relevant and material to

28   his appointment as a "qualified candidate" in this case.  Mr. Watkins' involvement in these

1    other proceedings may explain his delay in submitting his Final Report and Recommendation

2    in this case.  The Court's Markman Scheduling Order called for the Report to be submitted

3    within 30-days of the conclusion of the Markman Hearing. (Dkt.#52).  However, even though

4    the Markman Hearing concluded on February 23, 2006, Mr. Watkins did not submit the Final

5    Report and Recommendation until September 13, 2006, nearly seven months after the

6    Markman Hearing.  Considering Mr. Watkins' lack of candor with the Court and the Parties

7    regarding his serious ethical troubles and the significant delay in satisfying his obligation as

8    the Special Master, the Court finds that it is appropriate to reduce Mr. Watkins' stated fee.

9    See Cordoza v. Pacific States Steel Corp., 320 F.3d 989, 995 (9th Cir. 2003) ("A special

10   master is a 'surrogate' of the court 'and in that sense the service performed is an important

11   public duty of high order in much the same way as is serving in the Judiciary.'") (citation

12   omitted).  Based upon the Parties' representations, Mr. Watkins' has billed a total of

13   $63,799.50 for his services in this case.[5]  The Court finds, based upon the Special Master's

14   conduct, it is appropriate to reduce this amount by 1/2 or 50%, thus reducing Mr. Watkins'

15   compensation from $63,799.50 to $31,899.75.  See Newton v. Consolidated Gas Co., 259

16   U.S. 101, 106 (1922) (finding special master's pay excessive and reducing it).  Seeing that

17   the Plaintiff has already paid its original one-half portion of the Special Master's stated fee

18   of $63,799.50, the Court directs the Special Master to remit partial payment to reflect

19   Plaintiff's one-half obligation of the reduced amount of $31,899.75.  In addition, as

20   Defendants have only submitted partial payment, Defendants are directed to satisfy their one-

21   half obligation of this reduced amount.

22        **Accordingly,**

23        **IT IS HEREBY ORDERED** adopting in part the Special Master's Report and

24   Recommendation as the Order of the Court. (Dkt.#131).

25

26

---

27        [5] The Court relies on the Parties' representation of the total amount billed, because the
     Special Master failed to submit his final invoice to the Court for approval as required by the
28   Court's November 21, 2005 order. (Dkt.#52).

1    **IT IS FURTHER ORDERED** sustaining in part and overruling in part Defendants'

2    objections to the Report and Recommendation. (Dkt.#101). Defendants' objections are

3    sustained with respect to "substantially parallel said reflector." Defendants other objections

4    are overruled.

5    **IT IS FURTHER ORDERED** granting in part and denying in part Plaintiff's Motion

6    to Adopt the Report and Recommendation. (Dkt.#103)

7    **IT IS FURTHER ORDERED** denying Plaintiff's Motion to Dispense with Further

8    Briefing on Motion to Adopt. (Dkt.#105).

9    **IT IS FURTHER ORDERED** granting in part and denying in part Defendants'

10   Motion to  Disallow Compensation to the Special Master and to Disgorge Fees Paid

11   (Dkt.#106-3).  The Special Master's total fee is reduced by 1/2 or 50% to $31,899.75.  The

12   Special Master is ordered to remit payment to Plaintiff in the next fourteen (14) business days

13   reflecting the Plaintiff's one-half obligation of this reduced fee.   The Defendants shall

14   complete payment of the new reduced fee within the same time period.

15   **IT IS FURTHER ORDERED** setting this matter for a status hearing on August 20,

16   2007 at 2:00 p.m. to discuss future proceedings in this litigation.

17   DATED this 6th day of August, 2007.

18

19

20   _____
     Mary H. Murguia
     United States District Judge

21

22

23

24

25   _____
     Mary H. Murguia
     United States District Judge

26

27

28

- 16 -